**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-7096

SAMMY USSERY,

Plaintiff - Appellee,

v.

SGT. MANSFIELD; JAMES DUNLOW; TIMOTHY RUFFIN,

Defendants - Appellants,

and

DUSTIN WILKINS; SHELTON HARDISON; STACY HOGGARD; LILLIAN GILLIAM; SHERI WILLIAMS,

Defendants.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.   Terrence W. Boyle, District Judge.  (5:11-ct-03124-BO)

Argued:  April 8, 2015                    Decided:  May 19, 2015

Before MOTZ and GREGORY, Circuit Judges, and DAVIS, Senior Circuit Judge.

Affirmed by published opinion.  Judge Motz wrote the opinion, in which Judge Gregory and Senior Judge Davis joined.

**ARGUED**: Kimberly D. Grande, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants.   David Alexander Strauss, NORTH CAROLINA PRISONER LEGAL SERVICES, INC.,

Raleigh, North Carolina, for Appellee.  **ON BRIEF**: Roy Cooper, North Carolina Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants.

DIANA GRIBBON MOTZ, Circuit Judge:

Sammy Ussery brings this action pursuant to 42 U.S.C. § 1983, maintaining that a team of correctional officers employed excessive force when they forcibly extracted him from his prison cell.  The district court denied the officers' motion for summary judgment on the basis of qualified immunity.  The officers appeal and, for the reasons that follow, we affirm.


                              I.

The cell extraction at the center of this case occurred on July 9, 2008.  At that time, Ussery was incarcerated at Bertie Correctional Institution in Windsor, North Carolina, where the appellants -- Sgt. David Mansfield and Officers James Dunlow and Timothy Ruffin -- were employed.  The parties agree that the correctional officers, supervised by Sgt. Mansfield, forcibly removed Ussery from his cell, but they dispute many facts involved in the cell extraction.  We consider the facts in the light most favorable to Ussery, the non-movant.  See PBM Products, LLC v. Mead Johnson & Co., 639 F.3d 111, 119 (4th Cir. 2011).

Ussery contends that he and Sgt. Mansfield had "an antagonistic relationship," in part because of racial tension. He maintains that correctional officers had searched or "tossed" his cell numerous times in the days immediately preceding the

3

extraction, but never found any weapons or other contraband. On the morning of July 9, Sgt. Mansfield approached Ussery's cell and ordered him to exit. Ussery, fearing that his cell would be ransacked, refused to do so. In response, Sgt. Mansfield shot a burst of pepper spray into Ussery's cell. Ussery still would not leave the cell.

Sgt. Mansfield then assembled an extraction team of five correctional officers, including Officers Dunlow and Ruffin. A sixth officer videotaped the extraction, pursuant to prison policy. Sgt. Mansfield told the extraction team that Ussery had a weapon and had threatened to harm anyone who entered his cell. Ussery maintains he made no such threat, and apparently, no weapon was ever found.

Sgt. Mansfield ordered Ussery's cell unlocked, and the extraction team entered and restrained Ussery on the floor. According to Ussery, members of the extraction team then beat him repeatedly in the head and face with batons, punches, and kicks; he maintains that Sgt. Mansfield "kicked and stomped" on him. Eventually the extraction team cuffed Ussery's hands behind his back, shackled his feet together, and carried him out of his cell -- holding him by the cuffs and shackles in a position Ussery characterizes as "hogtied." At least one witness reported seeing blood on the floor, marking the path from Ussery's cell to the holding cage, to which the officers

4

took him.  In the holding cage, Ussery was belligerent and initially resisted efforts to clean him up.

The video of this incident depicts events consistent with Ussery's account of the incident in some respects.  As the district court noted, the viewer of the video can see that there is "a disturbance" in Ussery's cell during the extraction; that "someone begins to punch Ussery, but it is unclear which guard is doing so"; that "[a]t one point, the movement of Mansfield's body suggests that Mansfield may be kicking Ussery"; that Ussery is "cuffed or shackled" and "carried with his body facing toward the ground . . . by the shackles"; that he appears "bloody and [has] facial injuries" after the extraction; and that he is "verbally aggressive in the holding [cage]."  But as the court also noted, a viewer cannot discern additional details about the extraction because Sgt. Mansfield stood in front of the camera, "obstructi[ng]" the view of the cell, during most of the extraction.

Later in the day of the extraction, officers transported Ussery to Bertie County Memorial Hospital for emergency medical treatment.  There, doctors prescribed Ussery morphine for his pain and used antibiotic ointment and wound adhesives to treat his contusions.  Ussery maintains that "[a]s a direct and proximate result" of the officers' beating, he "suffered severe lacerations above his right eye and behind his left ear . . .

[and] extensive bruising of his head, neck, face, chest, and hands." He further maintains that "[m]edical records indicate that as a result of his injuries, [he] suffered increased bilateral hearing loss, neck pain, loss of vision in his right eye, chronic swelling and loss of feeling in his hands and knee, and recurring migraines," causing him "physical and emotional pain and suffering, and disability."

About five months after the extraction, the North Carolina Department of Corrections requested that the State Bureau of Investigation conduct an inquiry into the possible "inappropriate use of force by correctional staff during [this] cell extraction." The investigators were ultimately not able to reach a definitive determination as to "whether excessive force was used," but noted that the behavior of the correctional officers on the videotape "appears too aggressive for the situation and would be excessive force." The district attorney involved in the state's investigation of this incident wrote that Sgt. Mansfield's apparent blocking of the cell door during the video was "disturbing" and "precluded [the state] from investigating this matter fully." She concluded that "[b]ecause of the position of the camera operator, this has become a situation where it is the inmate's version versus the officers' version of events."

6

Acting pro se, Ussery filed this action, advancing Eighth Amendment excessive force and failure-to-protect claims. The complaint survived a frivolity review pursuant to 28 U.S.C. § 1915. Thereafter, the North Carolina Prisoner Legal Services undertook representation of Ussery in this matter and filed an amended complaint.

In response to Ussery's amended complaint, the officers admit that they forcibly extracted him from his cell when pepper spray proved insufficient to compel him to exit; that he was "escorted" out of his cell by the extraction team; and that he received medical treatment following the extraction. The officers, however, deny kicking or punching Ussery during the extraction. They contend that he suffered nothing more than de minimis injuries. To support that contention, they offer the affidavit of a doctor long employed by the North Carolina Division of Prisons. He opined, based on his examination of the prison's records, (not an examination of Ussery himself), that Ussery "incurred minor injuries including abrasions, contusions, and lacerations," which "healed completely without any lasting ill effects." On the basis of this affidavit, the officers moved for summary judgment, asserting entitlement to qualified immunity. Ussery opposed the motion -- relying on his account of his injuries, statements from some officers and inmates, his

7

medical records, the video, and the report of the state Bureau of Investigation.

The district court granted the officers' motion as to the failure-to-protect claim, but denied the motion as to the excessive force claim against Sgt. Mansfield and Officers Dunlow and Ruffin.[1]  The officers timely noted this appeal.

II.

The Supreme Court has explained that "the qualified-immunity defense shields government agents from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Behrens v. Pelletier, 516 U.S. 299, 305 (1996) (internal quotation marks and alterations omitted).  As the parties agree, the law clearly established at the time of the extraction governs the entitlement to qualified immunity here.  Further, they agree that Norman v. Taylor, 25 F.3d 1259 (4th Cir. 1994) (en banc), provides the legal framework for determination of that question.

---

[1] Ussery's complaint also names as defendants several other officers but he did not perfect service on them.  The district court therefore dismissed the complaint as to them.  In addition, the complaint alleges a state law negligence claim not addressed by the parties in the summary judgment papers or resolved by the district court.

8

In Norman, this court held that "absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is de minimis." Id. at 1263. The Supreme Court expressly abrogated Norman in Wilkins v. Gaddy, 559 U.S. 34, 38-39 (2010). The Court held in Wilkins that "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Id. at 38. We have subsequently concluded, however, that where the alleged use of force occurred prior to Wilkins, a defendant's entitlement to qualified immunity turns on whether that force "was objectively reasonable in view of the clearly established law at the time of the alleged event" -- i.e., the law as set forth in Norman. See Hill v. Crum, 727 F.3d 312, 321, 322 (4th Cir. 2013).

To prevail, then, an inmate like Ussery, seeking relief for excessive force deployed before the issuance of Wilkins in 2010, must establish either that he sustained more than de minimis injuries or that the defendants' use of force was "of a sort repugnant to the conscience of mankind and thus expressly outside the de minimis force exception." Norman, 25 F.3d at 1263 n.4 (internal quotation marks and citation omitted). With this standard in mind, we turn to the case at hand.

9

III.

Before reaching the merits of Ussery's excessive force claim, we must first address our jurisdiction over this interlocutory appeal.

In Mitchell v. Forsyth, 472 U.S. 511, 530 (1985), the Supreme Court held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."

The Court clarified the scope of interlocutory review of a denial of qualified immunity in Johnson v. Jones, 515 U.S. 304 (1995). There, a unanimous Court held that when a district court denies summary judgment to a defendant seeking qualified immunity "only" on the basis of "'evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial," the order does not provide the basis for an interlocutory appeal. Id. at 313. See also Iko v. Shreve, 535 F.3d 225, 234 (4th Cir. 2008) (separating "purely legal questions relating to qualified immunity that can and should be resolved at this [summary judgment] stage in the litigation" from "the district court's assessment of whether genuine issues of material fact make summary judgment inappropriate," which is not an appealable final order).

10

In resolving the officers' contention that qualified immunity entitles them to summary judgment on Ussery's excessive force claim, the district court first determined that "[t]aking the facts in the light most favorable to plaintiff, there was some injury to plaintiff. The degree of injury suffered is at most unclear within the record before the court." The court continued that, "regardless of the extent of the injury, on the record before the court . . . there remains a question of fact as to whether there are extraordinary circumstances so repugnant to the conscience of mankind that even in spite of de minimis injuries plaintiff could prevail on his excessive force claim." (internal quotation marks and citation omitted). The district court concluded that "[b]ased on the record before [it], defendants are not entitled to qualified immunity."

Johnson prohibits us from reviewing on interlocutory appeal the district court's conclusion that the record does not definitively indicate the extent of Ussery's injuries. Thus we cannot and do not review the district court's assessment of the evidence. However, in denying summary judgment, the district court necessarily held that Ussery could satisfy the Norman standard. To be sure, the court did not expressly state that Ussery could establish a violation of clearly established law under Norman. But to deny the officers' motion for summary judgment, the court had to reach that conclusion. We

11

undoubtedly have jurisdiction to review that purely legal conclusion.  See Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) ("[O]n appeal from the denial of summary judgment on the basis of qualified immunity, we merely decide whether on the facts assumed by the district court for summary judgment purposes, the defendant was entitled to qualified immunity.").[2]  Indeed, while Ussery contends in his brief that we lacked any jurisdiction over this appeal, at oral argument, he conceded that we do have jurisdiction to resolve this limited question.

Our jurisdiction in cases such as this is circumscribed but critical.  For the Supreme Court has made plain that qualified immunity "is an immunity from suit rather than a mere defense to liability" and "is effectively lost if a case is erroneously

---

[2] We note that an order denying summary judgment on the basis of qualified immunity would be entirely unreviewable if the defendant officers conceded that Ussery's version of the facts would establish that the officers violated clearly established law.  For example, in Culosi v. Bullock, the parties agreed that the qualified immunity inquiry turned on a factual question:  was the shooting death of the plaintiff the result of an intentional act by a police officer, or an accidental discharge of the officer's gun?  596 F.3d 195, 200 (4th Cir. 2010).  The defendants did not argue that even if the shooting was intentional, they would nonetheless be entitled to qualified immunity -- so no purely legal dispute remained between the parties.  Rather, "the version of facts ultimately accepted by the fact finder w[ould] dictate the outcome of the constitutional inquiry."  Id. at 200 n.6 (emphasis in original omitted).  Accordingly, we lacked jurisdiction over that appeal.  By contrast, the officers in this case challenge both legal and factual conclusions of the district court, and our interlocutory jurisdiction permits review of the legal conclusions.

12

permitted to go to trial."  Mitchell, 472 U.S. at 526 (emphasis in original).

IV.

We thus turn to the sole question over which we have jurisdiction:  whether the district court properly concluded that the officers were not entitled to summary judgment under Norman.

The officers contend that Ussery suffered only de minimis injuries and so cannot satisfy the requirements for an excessive force claim under Norman.  Blue Br. 8, 16-21.  We disagree. During the decade when Norman was good law, we never articulated a precise definition of what constitutes a de minimis injury. Nevertheless, our opinions from that period clearly illustrate that whether a plaintiff has satisfied the Norman standard depends on the particular facts of his case.

Ussery maintains that the officers caused "severe lacerations," "extensive bruising," "increased bi-lateral hearing loss," "loss of vision in his right eye," "chronic swelling and loss of feeling," "recurring migraines," and "physical and emotional pain and suffering" -- all of which resulted in "last[ing] physical and emotional damage."  Many of these injuries could have an enduring impact on health and well-being.  These are the sort of injuries that may affect mobility,

13

sensory capabilities, emotional stability, and other daily functions for an extended period of time.[3] And while we have held that "temporary swelling and irritation" constitute only de minimis injury under Norman, see Taylor v. McDuffie, 155 F.3d 479, 484 (4th Cir. 1998), overruled in part by Wilkins, 559 U.S. 34 (2010), we have also recognized that to satisfy Norman an inmate "need not show that . . . force caused an 'extreme deprivation' or 'serious' or 'significant' pain or injury." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)).

Moreover, on numerous occasions, applying the Norman standard, we have concluded that injuries comparable to -- and arguably less severe than -- those Ussery maintains he suffered were not de minimis. See, e.g., Orem v. Rephann, 523 F.3d 442, 448 (4th Cir. 2008) (holding that just two uses of a taser -- even if only "for a few seconds" at a time -- caused more than de minimis injury when the plaintiff "experience[d] electric

---

[3] Arguing to the contrary, the officers attempt to ignore Ussery's detailed account of his injuries, the medical records and witness statements he offered, and the video showing him during and after the extraction. The officers rely instead on the affidavit of a longtime prison physician who, without examination of Ussery, opined that his injuries were not serious. A factfinder may or may not ultimately agree with that assessment. But the district court concluded that "the degree of injury suffered" by Ussery was "unclear" on the evidence before it. As we have explained above, we lack jurisdiction to resolve on interlocutory appeal this issue of "evidence sufficiency." Johnson, 515 U.S. at 313.

14

shock, pain, and developed a scar"); <u>Young v. Prince George's Cnty.</u>, 355 F.3d 751, 758 n.3 (4th Cir. 2004) (holding that "a contusion, cut to his lips, bruises, lesions to his wrist, and a strained neck and back" exceed the de minimis threshold); <u>Robles v. Prince George's Cnty.</u>, 302 F.3d 262, 270 (4th Cir. 2002) (holding that where law enforcement officers restrained and abandoned an arrestee for ten minutes, causing him to "fe[el] frightened, vulnerable, and humiliated when left alone and immobile in the dark parking lot," such that "in the months following the incident he had trouble sleeping and was scared to leave his home, . . . [t]he resulting injury was more than de minimis").

Finally, we note the telling fact that the North Carolina Department of Corrections initiated an investigation into the cell extraction. At the very least, this investigation indicates that the state itself regarded the cell extraction as cause for alarm that might have resulted in more than de minimis injuries. The Department would hardly have launched such an investigation if there were no dispute that "the injury resulting from that force was not excessive." <u>Stanley v. Hejirika</u>, 134 F.3d 629, 637 (4th Cir. 1998).

Accordingly, given our obligation to take the facts in the light most favorable to Ussery, we must conclude that the

district court did not err in denying the officers' summary judgment on Ussery's excessive force claim.[4]

## V.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

[4] Having concluded that Ussery has described injuries sufficient to satisfy Norman's de minimis threshold, we need not reach the question whether, in the alternative, Ussery has presented facts placing this force incident within the ambit of the "extraordinary circumstances" exception to the de minimis requirement in Norman.

16